IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jennifer Cass,                 :
          Petitioner      :
                            :
     v.                 :  No. 1072 C.D. 2020
                            :
Unemployment Compensation  :
Board of Review,        :
          Respondent   :  Submitted: June 10, 2022

BEFORE:   HONORABLE ANNE E. COVEY, Judge
              HONORABLE ELLEN CEISLER, Judge
              HONORABLE LORI A. DUMAS, Judge

OPINION BY
JUDGE CEISLER                           FILED: August 19, 2022

Jennifer Cass (Claimant) petitions for review of the October 5, 2020 Order of the Unemployment Compensation Board of Review (Board) reversing the decision of a Referee awarding Claimant unemployment compensation (UC) benefits. The Board determined that Claimant was ineligible for UC benefits under Section 402(b) of the Unemployment Compensation Law (Law)[1] because she voluntarily quit her employment without a necessitous and compelling cause. We affirm the Board's Order.

## **Background**

Claimant worked for University of Pittsburgh Medical Center (Employer) from November 15, 2015, through March 27, 2020, most recently as a full-time clinical coordinator. Bd.'s Finding of Fact (F.F.) No. 1; Notes of Testimony (N.T.),

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(b). Under Section 402(b) of the Law, a claimant is ineligible for UC benefits if she voluntarily quit her employment without cause of a necessitous and compelling nature.

7/17/20, at 13.[2]  Claimant lived in Allegheny County, Pennsylvania, and worked in Employer's home health office in Butler County, Pennsylvania.  Bd.'s F.F. No. 2; N.T., 7/17/20, at 13.[3]

In October 2019, Claimant's husband accepted a full-time job position with the United States Navy in Maryland.  Bd.'s F.F. No. 3; N.T., 7/17/20, at 14, 30.[4] Beginning in October 2019, her husband rented housing in Maryland while Claimant remained with their two children in Pennsylvania.  Bd.'s F.F. No. 4.  Claimant planned to permanently join her husband in Maryland after the 2019-20 school year ended.  *Id.*

On March 13, 2020, Claimant and her husband learned that their children's school was switching to cyber school for at least two weeks, beginning on March 16, 2020, due to the COVID-19 pandemic.  *Id.* No. 5.  Their children's day care also closed at that time due to the pandemic.  *Id.* No. 6.

On March 15, 2020, Claimant drove her children to stay with her parents in South Carolina for two weeks.  *Id.* No. 7.  When Claimant and her husband learned that their children would not physically return to school for the remainder of the school year, they accelerated their plans to move, placed an offer on a home in Maryland, and decided that Claimant would resign from her position with Employer. *Id.* No. 8.

---

[2] The record shows that Claimant is a registered nurse.  *See* Record (R.) Item No. 3.

[3] Claimant explained that "UPMC Home Health provides medical home health [services] to different clientele and [her] team was the ped[iatric] and [obstetrics and gynecology] team." N.T., 7/17/20, at 13.  Claimant "work[ed] in [Employer's] office" as the team leader, "not in the field." *Id.*

[4] Claimant's husband testified that he previously worked for the United States Department of Veterans Affairs for six years and that, in October 2019, he accepted a higher paying position with the United States Navy in Maryland.  N.T., 7/17/20, at 30.

On March 20, 2020, Claimant submitted to Employer a notice of resignation effective April 10, 2020, with a request to use paid time off after March 27, 2020. *Id.* No. 9. On March 28, 2020, Claimant retrieved her children from South Carolina. *Id.* No. 10. On April 20, 2020, Claimant and her husband closed on their Maryland home and moved there. *Id.* No. 11.

Claimant filed an application for UC benefits, which the local Service Center granted. The Service Center found, based on its review of the initial claim record, that Claimant quit her employment for personal reasons. R. Item No. 4. The Service Center found that: (1) before quitting, Claimant informed Employer that she was moving out of state and did not have child care due to the pandemic; and (2) Employer did not offer any work-from-home alternatives. *Id.* Thus, the Service Center determined that Claimant had a necessitous and compelling reason to quit under Section 402(b) of the Law. *Id.*

Employer appealed to the Referee, who held a telephone hearing on July 17, 2020. Claimant testified that, at the time of her resignation, she resided in Allegheny County while working for Employer in Butler County. N.T., 7/17/20, at 14. The couple's two minor children, ages 11 and 7, lived with Claimant in Allegheny County. *Id.* Claimant's husband had resided in Maryland since October 2019 when he accepted a full-time job there. *Id.*

Claimant testified that on March 14, 2020, after the Governor's stay-at-home order, the couple decided to drive the children to South Carolina to stay with Claimant's parents because they had no other child care options in Allegheny County. *Id.* at 15, 17. Employer was considered an essential business under the Governor's order, so Claimant's office was not required to close. *Id.* at 20. Claimant testified:

3

I worked two weeks straight within whatever stipulations my Employer was requesting of to go into the office. And I just needed to sort of figure out a plan. But the idea of bringing the kids to South Carolina was because not only was school cancelled[,] but the YMCA program that we previously had paid for for child[]care was also . . . following the same guidelines as the North Allegheny School District, so they closed as well.

. . . .

Without child[]care I was unable to go to work without leaving my children at home. There[ was] no day[]care.

*Id.* at 16. Claimant explained that the couple's initial plan was for the children to stay with their grandparents in South Carolina for two weeks. *Id.* However, Claimant testified: "[W]hen the[ Governor] decided that schools were going to close for the rest of the year . . . [my husband and I] decided that I [would] resign. I had no choice." *Id.* When asked why the children could not stay with their grandparents until the summer, when Claimant had initially planned to move to Maryland, Claimant responded:

Well that's a different state. It's not even a bordering state. . . . [I]t's 10 hours, so it's quite far from . . . my children. We did it for two weeks so that I could have attention to my work for two weeks and also try to figure out . . . what was going on with school, but we were anticipating that school was going to resume after two weeks. So it was to reunite with my children and ideally not be spread across three different states.

*Id.* at 22.

Claimant testified that she and her husband could have hired a babysitter for $10 per hour, but that was "not [a] financially feasible" option because they were paying rent for two residences and had pre-paid for the children's summer camp through mid-July. *Id.* at 17. Claimant testified that they paid $1,350 per month for the Pennsylvania residence and $850 per month for the Maryland residence. *Id.*

4

Claimant estimated that their monthly expenses totaled between $2,500 and $3,000. *Id.* at 18. Claimant earned $37.50 per hour and worked 40 hours per week, totaling $6,000 per month before taxes. *Id.* at 18, 22.

When asked why Claimant could not afford to hire a babysitter, given her income and expenses, she replied, "[t]hat was a choice that my husband and I made." *Id.* at 23. Claimant testified that the couple decided that she would resign, rather than her husband requesting a leave of absence to care for the children, because they "were going to be relocating to Maryland . . . [e]ventually." *Id.*

Claimant testified that she "asked [Employer] from the beginning about working from home [but] there was no formal policy about working from home." *Id.* at 37. She stated that Employer allowed her to work from home "occasionally" on a "day[-]by[-]day" basis, but "[i]t was not offered as a full-time plan." *Id.*

Claimant's husband, Brett Cass, testified that in March 2020, due to the COVID-19 restrictions imposed by his employer, he was unable to travel home to help care for his children. *Id.* at 24. He testified that he did not look into child care options in Maryland because schools there were also closed and he did not know anyone in Maryland who could help with child care. *Id.* at 25.

Mr. Cass then explained the couple's plans following his relocation to Maryland:

> I accepted the position . . . with the [United States] Navy Bureau of Medicine in Madison[, Maryland]. The goal was that we would finish the school year out in North Allegheny, [my] wife and children would be living there. I would be renting in Maryland. I signed a lease until May 15th with a month[-]to[-]month option after that. So the goal was to have . . . the kids finish school in North Allegheny. We had paid [for] YMCA before and after[]school [care] as well as the first three weeks of summer . . . into the middle of July. The goal was that the kids would finish school and then we would start looking at houses

May/June-ish[] . . . with a July closure date and then relocate to Maryland permanently in July and then have the kids start school in September.

*Id.* Mr. Cass testified that he and Claimant began searching for a home in Maryland in March 2020. *Id.* However, shortly after they began their home search, they "got a text that schools were going to close that day and would not be open for two weeks." *Id.* Mr. Cass testified that he and Claimant made an "on-the-spot decision" that the children would stay with their grandparents in South Carolina and, after the Governor extended the school closure for another two weeks, they "didn't have many options." *Id.* at 25-26.

Mr. Cass also testified regarding the financial impact on his family during their separation as follows:

> We were manning two residences, paying taxes in two separate states, paying registration, insurance, . . . renter's insurance on two [residences]. So the bills to maintain two residences in two separate states is quite expensive. And then to throw in child[]care that you're already paying for one set of child[]care and without any of your opinion or input that child[]care option is taken away from you but they're still deducting money for that. And then say, oh well you could have just paid for another $500 a week [for child care]; that's an unrealistic expectation and . . . an unrealistic financial burden.

*Id.* at 26. Mr. Cass testified that he earned $109,000 per year, before taxes, as a federal employee. *Id.* at 28. He testified that Claimant's estimate regarding their monthly expenses was a "lowball estimate" and he believed their monthly expenses "far exceeded" $2,500 to $3,000. *Id.* at 28-29.

Mr. Cass testified that he and Claimant placed an offer on a house in Maryland "probably [at the] end of March" 2020 and they closed on the house on April 20, 2020. *Id.* at 27. He testified that although they were originally planning to move to

6

Maryland in mid-July, their plan "was sped up by the conditions surrounding the C[OVID] virus." *Id.* Mr. Cass explained:

> [T]he timeline was not the timeline of our choosing. The timeline that we had prepared for as a family and financially was end of the summer, after the school year, middle of July. We had to speed that up because of the events surrounding the virus. No one is arguing that . . . we weren't relocating to Maryland. That was always the plan. The plan was just not in this timeline.

*Id.* at 29. He testified that he "did not explore" the possibility of taking off from work or requesting a leave of absence because it "was always the[ir] decision" that Claimant would resign from her job. *Id.* at 30. Mr. Cass further testified that he accepted the Maryland position "because it was a raise for" him. *Id.*

Employer presented the testimony of Ashley Viecelli, Claimant's human resources consultant. Ms. Viecelli testified that Claimant was eligible for a leave of absence at the time she resigned. *Id.* at 31. Ms. Viecelli stated that leaves of absence "are not offered to employees," but "employees have the right to request them." *Id.* at 32.

Employer also presented the testimony of Gina Quinlan, Claimant's supervisor. Ms. Quinlan testified that prior to her resignation, Claimant did not request any type of leave or accommodation relating to child care. *Id.* at 32, 35. She testified that typically the employee initiates a request for leave; Ms. Quinlan does not routinely offer leave to an employee. *Id.* at 34. Mr. Quinlan further testified:

> [In March 2020] we were doing work from home sort of intermittently. We didn't have . . . any formal structure around it and so [Claimant] was able to work from home. . . . [W]e were working . . . with everybody. As everybody has said, . . . it was a really fluid time when things were changing on a day[-]by[-]day basis and[] . . . we were making accommodations for people as we could.

7

*Id.* Ms. Quinlan explained that, in March 2020, there was a human resources "call center" available to employees who "needed [to request] accommodations related to C[OVID]-19." *Id.* She testified that, at that time, "no one was really working from home" on a full-time basis; rather, they "were . . . doing . . . a staggered schedule to ensure that [the employees] were able to social[ly] distance in the office." *Id.* at 34-35. However, during her final week of work, at the end of March 2020, Claimant worked from home full-time. *Id.* at 32-33.

Following the hearing, the Referee affirmed the Service Center's decision, concluding that Claimant had a necessitous and compelling reason to quit her employment. The Referee found that Claimant demonstrated "urgent child[]care issues which developed in an unforeseen manner during the COVID-19 pandemic when schools and day[]cares in Pennsylvania temporarily closed." Ref.'s Order, 7/23/20, at 3. The Referee also determined that "[C]laimant exhausted all reasonably available alternatives" before she resigned. *Id.* at 3-4.

Employer appealed to the Board, which reversed the Referee's decision. The Board made its own findings of fact and credibility determinations based on its review of the record and concluded as follows:

> [C]laimant testified she quit because she lacked child care, but [E]mployer argues she quit to follow her spouse to Maryland. [C]laimant admitted to having plans to follow her spouse to Maryland, but argued they were not to be consummated until the summer, after their children's school year was over. Based on the entire record, it appears that the couple did not want to incur the costs of maintaining two households, but were willing to for the convenience of their children finishing school. When advised the children were going to be attending cyber[]school for the remainder of the academic year, and proximity to the school was no longer required to attend classes, the couple accelerated their plans by placing an offer on a home and deciding [C]laimant would resign [from her employment]. Further,

8

[C]laimant did not satisfactorily explain why her children could not remain with their grandparents indefinitely, considering that the[ children] were adequately participating in cyber[]school while in South Carolina. Consequently, *the Board concludes that [C]laimant's child care excuse is a pretext and the real reason for her resignation was to relocate to be closer to her spouse's new job.*

Maintaining the family unit by moving to be with one's spouse is a necessitous and compelling reason to leave work *if the spouse's relocation was outside his control and the move created an insurmountable commuting problem or economic hardship in maintaining two residences. [C]laimant's spouse admitted he applied for th[e Maryland] job as a career advancement, so it was certainly within his control. Consequently, [C]laimant lacked a necessitous and compelling reason to leave [her employment].*

Bd.'s Order, 10/5/20, at 2-3 (emphasis added). Claimant now petitions for review of the Board's decision.[5]

### Analysis

On appeal, Claimant contends that her "decision to leave the position [with Employer] was based on the economic unfeasibility of the status quo as well as the fact that her family was split across the entire country in an attempt to find child[]care." Claimant's Br. at 10. Claimant asserts that under the follow-the-spouse doctrine, she had a necessitous and compelling reason to quit her employment because the "reason for the relocation was the need of the family" and "not [her husband's] preference" to take the job in Maryland. *Id.* at 11; *see* Pet. for Rev. ¶ 7. We disagree.

In cases involving a claimant who voluntarily terminates her employment to join a relocating spouse, we apply the follow-the-spouse doctrine, which was first

---

[5] Our scope of review is limited to determining whether constitutional rights were violated, an error of law was committed, or the necessary factual findings are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa. C.S. § 704.

9

recognized in *Wheeler v. Unemployment Compensation Board of Review*, 450 A.2d 775 (Pa. Cmwlth. 1982). Under the follow-the-spouse doctrine, the claimant's burden is two-fold. *Rodriguez v. Unemployment Comp. Bd. of Rev.*, 174 A.3d 1158, 1164 (Pa. Cmwlth. 2017) (citing *Wheeler*, 450 A.2d at 778). First, the claimant must prove that the move created insurmountable commuting problems or that maintaining two residences would result in economic hardship. *Id.* Second, the claimant must prove that: (1) circumstances beyond the spouse's control caused the need to relocate; (2) the decision was reasonable and made in good faith; and (3) the relocation was not a result of the spouse's personal preference. *Id*. The claimant may satisfy the second prong by demonstrating, for example, that her spouse's position was eliminated, that there was a limited job market due to the highly specialized nature of her spouse's occupation, or that her spouse's job would be eliminated. *Id*. However, the desire to maintain the family unit, by itself, is insufficient to establish a necessary and compelling reason to quit one's employment. *Schechter v. Unemployment Comp. Bd. of Rev.*, 491 A.2d 938, 941 (Pa. Cmwlth. 1985).[6]

First, Claimant argues that she satisfied the first prong of the follow-the-spouse doctrine because she and her husband experienced economic hardship during their separation. However, the record shows that the couple was able to maintain

---

[6] We note that the Referee did not analyze this case under the follow-the-spouse doctrine, instead applying the standard for analyzing a voluntary quit for lack of child care. *See* Ref.'s Order, 7/23/20, at 3. In its appeal to the Board, Employer argued that the Referee erred in failing to apply the follow-the-spouse doctrine. The Board agreed and applied the doctrine in its decision. *See* R. Item Nos. 12 & 15. On appeal to this Court, Claimant does not challenge the Board's application of the follow-the-spouse doctrine and, in fact, argues her appeal under that standard. In her Petition for Review, she specifically contends that the Board "erred when it held that [she] did not meet the standard under the 'follow[-]the[-]spouse doctrine.'" Pet. for Rev. ¶ 7; *see* Claimant's Br. at 13, 17.

two separate residences for five months, with the intent to continue doing so for several more months, as they both testified that they planned to live apart until mid-July 2020. Bd.'s F.F. No. 4; N.T., 7/17/20, at 21, 25. They also made an offer to purchase a home in Maryland in March 2020, prior to Claimant's resignation, and they closed on the new home in April 2020. *See* R. Item No. 3 (in her March 20, 2020 resignation letter, Claimant stated that she and her family were "eagerly awaiting to close on [their] new home in [their] new home state of Maryland on April 20th"). The Board also discredited Claimant's and her husband's testimony that they could not afford to pay for child care, as Claimant testified that they did not consider hiring a babysitter because "[t]hat was a choice that my husband and I made" and because their plan was "always" that she would resign and move to Maryland. N.T., 7/17/20, at 23, 29-30; *see* Bd.'s Order, 10/5/20, at 2 (finding that Claimant's "child care excuse" was a "pretext"). Therefore, we conclude that Claimant failed to establish that her decision to quit her job to follow her husband to Maryland was the result of economic hardship. *Cf. Schechter*, 491 A.2d at 940 (holding that the claimant failed to meet her burden under the follow-the-spouse doctrine, where the Board found that her decision to quit was not necessitated by economic hardship or commuting problems, since the couple had successfully commuted and maintained two residences for two years and her decision to quit was based on the couple's personal preference of raising their child together).

Even if Claimant had established economic hardship, however, we conclude that she also failed to satisfy the second prong of the follow-the-spouse doctrine, because her husband's relocation was not the result of circumstances beyond his control. *See Wheeler*, 450 A.2d at 778 ("[T]he unique circumstances of a following spouse's [UC] claim require the Board to consider *not only* the claimant's economic

11

necessity and insurmountable commuting problems[,] *but also the motivations and circumstances of the [spouse's] relocation*.") (emphasis added). In her brief, Claimant asserts that "[a]t no point was any evidence offered that [she] and her husband had a personal desire to move." Claimant's Br. at 15. This assertion, however, is belied by the record. The evidence presented at the hearing established that Claimant's husband moved to Maryland in October 2019 to accept a higher-paying job, several months before the COVID-19 pandemic struck Pennsylvania. *See* N.T., 7/17/20, at 30; Bd.'s F.F. No. 3. The record also establishes that after Mr. Cass's relocation, the couple immediately began planning for Claimant and their children to permanently move to Maryland after the school year ended. *See* N.T., 7/17/20, at 20-21; Bd.'s F.F. No. 4. Indeed, in February 2020, Claimant began the process of becoming licensed to work as a nurse in Maryland, and a few weeks later, the couple began searching for a home in Maryland. *See* N.T., 7/17/20, at 20, 25. Claimant further testified that the reason she resigned after her children's school closed, rather than her husband, was because the couple had already decided that they "were going to be relocating to Maryland . . . [e]ventually." *Id.* at 23; *see also id.* at 29 (Mr. Cass testified: "No one is arguing that . . . we weren't relocating to Maryland. *That was always the plan*.") (emphasis added). Therefore, we conclude that the record contains substantial evidence to support the Board's finding that Mr. Cass's relocation to Maryland was not due to circumstances beyond his control, but due to his personal preference of accepting a better job. *See Leason v. Unemployment Comp. Bd. of Rev.*, 198 A.3d 509, 515 (Pa. Cmwlth. 2018) (finding the claimant's decision to quit his job and relocate to be with his wife was not motivated by circumstances beyond his wife's control, where he "did not present evidence or develop an argument that the couple's financial situation was so dire

12

that it necessitated relocation"); *Rodriguez*, 174 A.3d at 1165 (finding the claimant failed to satisfy the follow-the-spouse doctrine, where the evidence showed that her husband's "relocation to Florida was not done in order to accept an offer of employment in a highly-specialized field with a limited job market or because his job was going to be eliminated").

Claimant also argues, without any citation to the record, that "the [children's] grandparents [did] not hav[e] the home infrastructure for remote learning" and that "the burden on the grandparents was insurmountable." Claimant's Br. at 10, 13-14. However, Claimant presented no evidence at the hearing to support these contentions. Claimant testified only that the children "had their computers with them in South Carolina and they were doing [c]yber [s]chool for two weeks with [her] parents," who "are elderly" and "retired." N.T., 7/17/20, at 22. Consequently, the Board determined that Claimant "did not satisfactorily explain why her children could not remain with their grandparents" until the couple's anticipated move to Maryland that summer, finding that the children "were adequately participating in cyber[]school while in South Carolina." Bd.'s Order, 10/5/20, at 2; *see also* N.T., 7/17/20, at 21-22 (Claimant admitted that, in past years, her children had spent part of their summers with her parents in South Carolina). The Board specifically discredited Claimant's testimony on this issue, Bd.'s Order, 10/5/20, at 2-3, and we will not disturb that credibility finding on appeal. *See Oliver v. Unemployment Comp. Bd. of Rev.*, 5 A.3d 432, 438 (Pa. Cmwlth. 2010) (stating that the Board's findings are conclusive on appeal when the record, as a whole, contains substantial evidence to support those findings).

Claimant maintains that she and her husband "needed to live together in order to support their family," Claimant's Br. at 14, but our case law holds that the desire

to maintain the family unit is alone insufficient to establish a necessary and compelling reason to voluntarily quit one's employment. *See Rodriguez*, 174 A.3d at 1664; *Schechter*, 491 A.2d at 941. While we certainly appreciate the difficulties and uncertainties that the COVID-19 pandemic presented in March 2020, Claimant and her husband admitted that it was "always" their plan that Claimant would quit her job in Pennsylvania and move to Maryland in July 2020; the circumstances of the pandemic simply prompted them to accelerate that plan by three months. Claimant contends that she had no choice but to resign because she lacked available child care; however, Claimant admitted that she did not hire a babysitter, or look into any other child care or leave option, because her only plan was to follow her husband to Maryland. The Board concluded, based on the credible evidence of record, that the lack of child care was "a pretext" and "the real reason for [Claimant's] resignation was to relocate to be closer to her spouse's new job." Bd.'s Order, 10/5/20, at 2.

## Conclusion

In sum, we conclude that Claimant failed to establish that circumstances beyond her husband's control caused his need to relocate. Rather, the record shows that his decision to relocate to Maryland was the result of his personal preference for a higher-paying job. As this Court observed in *Rodriguez*, "it is not the purpose of [UC] to be a vehicle through which a family may finance a *voluntary change of career* . . . ." 174 A.3d at 1165 (emphasis added). The purpose of UC "is to ensure that employees *who become unemployed involuntarily* are provided with some semblance of economic security." *Hamot Med. Ctr. v. Unemployment Comp. Bd. of*

14

*Rev.*, 645 A.2d 466, 469 (Pa. Cmwlth. 1994) (emphasis added).  Accordingly, we affirm the Board's Order.

_____
ELLEN CEISLER, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jennifer Cass,                          :
                 Petitioner             :
                                        :
        v.                              :   No. 1072 C.D. 2020
                                        :
Unemployment Compensation               :
Board of Review,                        :
                 Respondent             :

# **O R D E R**

AND NOW, this 19th day of August, 2022, the Order of Unemployment Compensation Board of Review, dated October 5, 2020, is hereby AFFIRMED.

_____
ELLEN CEISLER, Judge